**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| T.W., a minor, by and through his father, THOMAS WALTMAN, and his mother, KAREN WOJTOWICZ, THOMAS WALTMAN, individually, and KAREN WOJTOWICZ, individually, | No. 4:20-CV-01688 <br><br> (Judge Brann) |
| Plaintiffs, | |
| v. | |
| SOUTHERN COLUMBIA AREA SCHOOL DISTRICT, | |
| Defendant. | |

**MEMORANDUM OPINION**

**NOVEMBER 30, 2020**

Pending before this Court is a motion for a preliminary injunction filed by Plaintiffs[1] on September 17, 2020.  Plaintiffs commenced this action on September 16, 2020 pursuant to 42 U.S.C. § 1983 after T.W. was suspended from participating in all school athletic programs for the 2020-21 school year for violating the Southern Columbia School District's Code of Conduct.  T.W. seeks injunctive relief to prevent Defendant, the Southern Columbia School District, from enforcing the applicable section of its Code of Conduct against him, thereby lifting his suspension and allowing him to play sports this year.  T.W. asserts that

---

[1]   Plaintiffs include T.W. (by and through his mother, Karen Wojtowicz, and his father, Thomas Waltman), Karen Wojtowicz, and Thomas Waltman.

the policy is invalid on its face and as applied, and raises equal protection, substantive due process, and procedural due process challenges to his suspension.[2]

This matter is now ripe for the Court's consideration.  For the following reasons, Plaintiffs' motion for a preliminary injunction is denied.

## I.     BACKGROUND

### A.     The District Code of Conduct and Student Handbook

This case arises from the Southern Columbia School District's Code of Conduct.  The District has formalized its Code of Conduct in its High School Student Handbook (the "Handbook").[3]  Acknowledging that participation in extracurriculars is a "privilege and not a right," Section VII of the Handbook explains that those who participate in extracurriculars will be held to a higher standard than those who do not.[4]  The purpose of holding these students to a higher standard is to "instill in students a respect for good citizenship in the form of positive peer pressure."[5]  Accordingly, Section VII states that the Code of Conduct will be enforced against such students "regardless of whether the offense occurs on

---

[2]   In their Amended Complaint, Plaintiffs also raised a state-law claim challenging the basis of T.W.'s suspension.  Doc. 11.  However, they have omitted this claim from their briefing on the present motion.  The Court therefore declines to address the issue now.

[3]   Doc. 11-1.

[4]   *Id.* at 39.

[5]   *Id.* at 41.  The general purpose of the Handbook is to "give school district students and their parents/guardians an understanding of the general rules and guidelines for attending and receiving an education at Southern Columbia Area High School."  *Id.* at 1.  Additionally, the District's Athletic Handbook, which applies only to student-athletes, states that its purpose is to "provide students the opportunity to learn responsibility, dedication, leadership, hard work, respect for the rules, respect for authority, and many other positive qualities."  Doc. 32-13 at 5.

or off school property."[6]  Supplementing the rules listed in the general Code of

Conduct, Section VII sets forth additional rules applicable only to those involved

in extracurriculars.[7]

    One such rule (and the rule at issue in this case) prohibits students from

"attending any event in which underage drinking, smoking, or drug use is

occurring" (the "Drug and Alcohol policy").[8]  Actual consumption of alcohol or

drugs is not required to establish a violation.[9]  On its face, this rule applies to all

students subject to Section VII, and thus to all students who participate in

extracurriculars.[10]  On the next page, the Handbook includes a section titled

"Tobacco/Nicotine Products/Alcohol/Controlled Substances/Paraphernalia."[11]

This section prohibits students from selling, giving, delivering, using, possessing,

or being under the influence of alcohol or drugs.[12]

    Immediately below this section, the Handbook specifies punishments for

violations of this rule.[13]  These punishments are as follows.  A first violation results

in the student's suspension from 25% of the games of the current or upcoming

---

[6]   Doc. 11-1 at 39.
[7]   *Id.* at 39-45.
[8]   *Id.* at 40.  Students will not be disciplined for attending such an event if, after determining in a
      reasonable amount of time that a violation has occurred, they immediately leave the premises.
      *Id.*
[9]   *Id.* at 41.
[10]  *Id.* at 40.  The Handbook explicitly provides that "[a]ny student involved in an extra-curricular
      program who is found to be in violation of any of the infractions mentioned [within Section
      VII] will face disciplinary action."  *Id.*
[11]  *Id.* at 41.
[12]  *Id.*
[13]  *Id.*

season in which the student has intended to participate.[14]  A second violation results in a suspension from 50% of such games.[15]  And a third violation results in a suspension from all interscholastic athletics for one full calendar year.[16]  These specific punishments were first adopted in the 2019-2020 Handbook.[17]  Prior to this year, the punishments for violating the District's Drug and Alcohol Policy involved suspending a student "from game competition" or "extra-curricular activities" for a fixed number of days.[18]

After listing these punishments, the Handbook then repeats the rule that no student shall attend any off-campus parties or gatherings where alcohol or drug use occurs.[19]  The Handbook does not include any other specific punishments within Section VII.  However, the Handbook does provide that coaches or advisors have the authority to impose "reasonable sanctions, which may include extra workouts, suspension from practice or competition, or removal from the activity for students who breach team/group conduct expectations but do not engage in prohibited conduct."[20]  The Handbook further states that "[a] student's failure to maintain good conduct, regardless of whether the behavior is school-related, will be grounds

---

[14]  *Id.*
[15]  *Id.*
[16]  *Id.*
[17]  Doc. 31 at 1 n. 1.
[18]  *Id.* at 8.  For example, a first violation of the rule resulted in a forty-five-day suspension, a second in a full calendar year suspension, and a third in a total suspension for the remainder of a student's enrollment in the District.  *Id.*
[19]  Doc. 11 at ¶ 41.
[20]  *Id.* at ¶ 43.

for disciplinary action ranging from counseling to immediate suspension or removal from the team or group depending on the severity of the misconduct."[21]

Section VII also lays out the procedures for establishing a violation and imposing sanctions.[22]  When the school learns that a violation has occurred, the "Principal or the Principal's designee shall give the student oral notice of the allegations and an opportunity to explain or defend the conduct."[23]  The Principal or designee will then determine if the violation has occurred and will impose sanctions as appropriate.[24]  The Handbook maintains that all students will be provided due process, which it defines as notice of the alleged violation and an opportunity for the student to tell his or her story.[25]

### B.      T.W.'s Violations of the District Code of Conduct

T.W., a seventeen-year-old student athlete and senior at the Southern Columbia Area High School, has been suspended three times for violating the Drug and Alcohol policy.[26]  He is one of twenty-five student-athletes who have been punished for violating the policy over the past three years.[27]

First, in November 2019, T.W. was arrested for driving under the influence of alcohol.[28]  After T.W. and his family voluntarily reported the incident, T.W. and

---

[21]  Doc. 31-5 at 35.
[22]  *Id.*
[23]  *Id.*
[24]  *Id.*
[25]  *Id.*
[26]  Doc. 11 at ¶¶ 1, 14, 18, 23.
[27]  The Court finds cheerleaders to be student-athletes for purposes of this motion.
[28]  Doc. 32 at 4.

his mother met with the District to discuss possible consequences.[29]  The District suspended T.W. for 2.5 games, or 25 percent of the 2019 football season.[30]  T.W. was also required to undergo drug and alcohol counseling, and was placed on probation by law enforcement.[31]

Second, in February 2020, T.W. attended a party in which underage drinking was occurring.[32]  T.W. did not consume alcohol or drugs at the party.[33]  T.W. and his mother subsequently met with Principal William Callahan to discuss the incident, and the District decided to suspend T.W. for the remainder of the school year and the first four football games of the 2020-21 school year.[34]  After several meetings between T.W. and his family and the District, the District lifted T.W.'s suspension as to the four football games.[35]

Third, on September 5, 2020, T.W. again attended a party where underage drinking was taking place.[36]  Police showed up at the party after receiving a complaint.[37]  They were turned away, however, and returned again later that evening with a warrant to search the house.[38]  Despite not drinking any alcohol,

---

[29]  *Id.* at 4-5.
[30]  *Id.* at 5.
[31]  *Id.*
[32]  *Id.*
[33]  Doc. 1 at ¶ 21.
[34]  Doc. 32 at 5.
[35]  *Id.* at 5-6.
[36]  Doc. 28 at 25:4-8.
[37]  *Id.*
[38]  *Id.*

T.W. was given a citation for being in attendance at the party.[39]  The next day, on

September 6, 2020, two student-athletes contacted varsity football coach James

Roth, informing him that T.W. was at that party.[40]  Coach Roth in turn relayed this

information to James Becker, the District Superintendent, who conveyed it to

Principal Callahan.[41]

　　　On September 8, 2020, two days later, Mr. Callahan called T.W.'s mother to

notify her that the District had reasonable suspicion to believe that T.W. was at the

September 5, 2020 party.[42]  On that phone call, Mr. Callahan did not state the basis

for the District's reasonable suspicion, but he scheduled a meeting with T.W., his

mother, and his stepfather later that day at school.[43]

　　　Lasting less than four minutes, it is clear the meeting did not go well.[44]  Mr.

Callahan first stated that he had reasonable suspicion to believe that T.W. was at

the September 5, 2020 party.[45]  However, after asking T.W. if he was in fact at the

party, T.W.'s stepfather directed T.W. not to answer any questions.[46]  T.W.'s

stepfather then apparently demanded that Mr. Callahan present his evidence

---

[39]  *Id.* at 25:12-17.
[40]  *Id.* at 58:24-59:19.
[41]  *Id* at 60:12-14.
[42]  *Id.* at 60:20-61:2.
[43]  *Id.* at 61:3-16.
[44]  *Id.* at 61:25-62:1.
[45]  *Id.* at 62:3-5.
[46]  *Id.* at 62:7-63:7 ("T.W. didn't say a word.").

supporting the charges.[47]  After Mr. Callahan declined to do so, T.W. and his family, without answering any of Mr. Callahan's questions, "got up and left."[48]

Neither T.W. nor any of his family members contested the allegations brought against him.  T.W. did not contest that he was actually present at the party, and he did not deny that he violated the Handbook's policy.  Though the District sent a letter to T.W.'s parents providing them an opportunity to seek an informal hearing with the District, T.W. and his family never responded.[49]  The letter stated that the District had reasonable suspicion that T.W. had attended a party where underage drinking had occurred, and reiterated that T.W. had the opportunity to request an informal hearing to discuss the charges.[50]  T.W. and his family never responded to the letter or met with District representatives regarding this incident. Per the letter, T.W. was subsequently suspended from participating in athletics for a full calendar year.[51]

## C.    Procedural Posture

Plaintiffs initiated this suit against the District on September 16, 2020 to challenge the constitutionality of the District's policy forbidding students from attending parties where underage drinking or drug use occurs.[52]  Plaintiffs raised

---

[47]  *Id.* at 62:9-11.
[48]  Doc. 32 at 8.
[49]  *Id.*
[50]  Doc. 32-3.
[51]  *Id.*
[52]  Doc. 1.

equal-protection, procedural due process, substantive due process, and state law claims challenging the policy. They sought both a temporary restraining order and preliminary injunction enjoining the District from enforcing this policy against T.W., thus allowing him to participate in athletics for the remainder of the 2020-2021 school year.[53]

The Court denied Plaintiffs' motion for a temporary restraining order because they had not shown a likelihood of success on the merits.[54] Following an evidentiary hearing on October 15, 2020 and an expedited briefing schedule, this Court now considers Plaintiffs' motion for a preliminary injunction.[55]

## II.   STANDARD OF REVIEW

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances."[56] A party seeking a temporary restraining order must establish four factors: "(1) a likelihood of success on the merits, (2) the probability of irreparable harm if the relief is not granted, (3) that granting injunctive relief will not result in even greater harm to the other party, and (4) that granting relief will be in the public interest."[57] Courts use a balancing test to determine whether

---

[53]   Doc. 3.
[54]   Doc. 15.
[55]   Doc. 14.
[56]   *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (citing *Morton v. Beyer*, 822 F.2d 364, 376 (3d Cir. 1987)).
[57]   *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994) (citing *Frank's GMC Truck Center*, 847 F.2d at 102). "The standards for a temporary restraining order are the same as those for a preliminary injunction." *Id.* (internal citations omitted).

injunctive relief is warranted.[58]  However, the movant bears the ultimate burden of establishing all four elements.[59]

## III.   DISCUSSION

### A.    Likelihood of Success on the Merits

The first factor to consider is whether the movant can demonstrate that their claims have a likelihood of success on the merits. To satisfy this showing, a movant need only establish a *prima facie* case demonstrating a "reasonable probability" of success;[60] they are not required to prove that success is "more likely than not."[61]  Nevertheless, as with the other three factors, the movant bears the burden of making this showing.[62]

Plaintiffs' legal strategy has changed little since they commenced this action. Though Plaintiffs now seem to have dropped their state-law claim and have introduced new evidence, they have largely doubled down on the same arguments that this Court previously rejected.[63]  Because this new evidence cannot overcome

---

[58]  *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975).
[59]  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 486 (3d Cir. 2000).
[60]  *Issa v. School Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (internal quotations omitted).
[61]  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 n. 3 (3d Cir. 2017) (internal quotations omitted).
[62]  *Adams*, 204 F.3d at 486.
[63]  Plaintiffs' briefing in support of their motion for a preliminary injunction has omitted any reference to the state-law claim included in their original complaint.  Doc. 31.  The Court will thus not address the issue in this opinion.  However, to the extent that Plaintiffs still wish to assert this claim, the Court finds it is as unlikely to succeed on the merits as it was in their motion for a temporary restraining order.  Doc. 15; *T.W. v. Southern Columbia Area School District*, No. 20-CV-1688, 2020 WL 5751219, at *7-8 (M.D. Pa. Sept. 25, 2020).

the legal barriers impeding Plaintiffs' case, the Court cannot find that Plaintiffs are likely to succeed on the merits of any of their claims.

### 1.    Equal Protection Claim

T.W.'s equal protection claims are unlikely to succeed on the merits.  Equal-protection claims, when not involving a suspect class or fundamental right, will be governed by the "rational basis test."[64]  Under this test, government action will be upheld so long as it "rationally furthers some legitimate, articulated state purpose."[65]  The rational-basis test is a heavy burden to overcome, as "it has long been settled that the Equal Protection Clause is offended only by laws that are invidiously discriminatory—only by classifications that are wholly arbitrary or capricious."[66]  Because the District's policy does not implicate a suspect class or fundamental right, T.W.'s equal-protection claims are governed by the rational basis test.[67]

T.W. challenges two aspects of the District's Handbook.  First, he argues that the Drug and Alcohol policy unconstitutionally discriminates against student-

---

[64]   *Moreland v. Western Pennsylvania Interscholastic Athletic League*, 572 F.2d 121, 124 (3d Cir. 1978).

[65]   *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

[66]   *Id.* (J., Stewart, concurring).

[67]   Participating in "extra-curricular activities is not a fundamental right under the Constitution." *Palmer by Palmer v. Merluzzi*, 868 F.2d 90, 96 (3d Cir. 1989).  And Plaintiffs are incorrect in their assertion that any due-process right created by the District's Handbook somehow makes it a fundamental right for purposes of equal protection analysis.  As the District has pointed out, a fundamental right is one emanating from the Constitution; consequently, any due-process right created by the District's Handbook does not emanate from the Constitution and does not alter the standard of review this Court will use to analyze Plaintiffs' equal protection claim.  *Kirby v. Loyalsock Twp. Sch. Dist.*, 837 F. Supp. 2d 467, 477 (M.D. Pa. 2011).

athletes both facially and as-applied.  He contends that the policy, on its face, provides punishments that can only be applied to student-athletes.  He also maintains that the policy has been discriminatorily enforced against athletes over the past three years.  Second, and more broadly, T.W. argues that Section VII of the Handbook is unconstitutional because it sets higher standards for students who participate in extracurriculars than those who do not.[68]

None of these arguments are persuasive because, fundamentally, T.W. fails to show that any of these purportedly discriminatory distinctions between student-athletes and non-student-athletes are irrational or arbitrary.  As a result, the Court finds T.W. is unlikely to succeed on the merits of any of his equal-protection claims.

### a.    Drug and Alcohol Policy

The Drug and Alcohol policy is constitutional both on its face and as-applied.  T.W. argues that the policy discriminates against athletes because its punishments, which measures suspensions by "games" or "seasons," only apply to athletes.  In support of this position, T.W. cites to Mr. Callahan's concession that

---

[68]  T.W. also asserts that the policy is unconstitutional because it is irrational to punish students for "not consuming alcohol."  Doc. 31 at 15.  This claim is more properly categorized as one of substantive due process; it does not allege any classification or discrimination (even on a class-of-one basis) that allow for a claim under the Equal Protection Clause.  Even if the Court were to consider such a claim, it is clearly foreclosed.  It is well-settled that schools have a strong interest in preventing and discouraging drug use amongst students.  *Morse v. Frederick*, 551 U.S. 393, 407 (2007).  Accordingly, the Court cannot hold that prohibiting students from attending parties where underage drinking or drug use is occurring is not rationally related to such a goal.

the policy itself facially distinguishes between student-athletes and non-student athletes.[69]  Further, he claims that the District's choice to use the "games" and "seasons" language is "conclusive proof" that the District intended this policy to apply only to student-athletes, and not those participating in other extracurricular activities.

T.W.'s argument fails, however, because it selects the incorrect unit of measurement to analyze the alleged discrimination.  T.W.'s argument assumes that student-athletes are discriminated against because the Drug and Alcohol policy prescribes punishments that are solely applicable to student-athletes.  But T.W. misses the fact that Section VII *as a whole* does not distinguish between student-athletes and those participating in other extracurriculars.

Section VII explicitly states that any student who violates this policy "*will face disciplinary action*."  The Handbook is not required to list in detail every punishment that every student may conceivably face if they violate the policy. And it is clear from the language of Section VII that any student who participates in extracurriculars is subject to punishment for violating any policy contained within the Handbook.  That Section VII explicitly states that a "*student's* failure to maintain good conduct" may result in "immediate suspension or removal from the

---

[69]   Doc. 28 at 79:11-14.

team *or group*" sufficiently shows that the listed punishments are not the exclusive means of enforcing this rule.[70]

Moreover, even if T.W. could show that the Drug and Alcohol policy did discriminate against student-athletes, T.W. has failed to show why such discrimination is irrational.  The District's Athletic Handbook states that participation in interscholastic sports is intended to teach students "responsibility, dedication, leadership, hard work, respect for the rules, respect for authority, and many other positive qualities."[71]  Clearly, prohibiting student-athletes from attending parties is rationally related to promoting these values.[72]

Despite framing their position narrowly, T.W. essentially asks this Court to find that all students who participate in extracurriculars must be treated exactly the same.  But this is not how the Equal Protection Clause works.  To hold as T.W. asks would throw into doubt every restriction that applies solely to student-athletes.  This would implicate the District's Athletic Handbook, as well as any policy the District has created specifically regulating interscholastic sports.[73]

---

[70]   Doc. 32-5 at 5.  Moreover, as the District correctly points out, various extracurriculars measure their participation using "games" and "seasons."  For example, a member of the debate team who violates this policy will be suspended for an equivalent number of matches as a student-athlete would for the same violation.

[71]   Doc. 32-13 at 5.

[72]   T.W. cites *Christian Heritage Academy v. Oklahoma Secondary Sch. Acitvities Ass'n* for the proposition that it is irrational to distinguish between student-athletes and those who participate in other extracurriculars.  483 F.3d 1025, 1031 (10th Cir. 2007).  This case is not helpful for T.W., however, because the decision dealt with an arbitrary distinction between *public* and *private* schools, not between athletes and non-athletes.  *Id.* at 1033.

[73]   *See id. generally*.  The Athletic Handbook sets forth numerous requirements that apply only to student-athletes.  For example, student-athletes may be punished for not behaving "in a

Being wary of issuing such a sweeping ruling without significant supporting authority, the Court concludes T.W.'s facial challenge to the Drug and Alcohol policy is unlikely to succeed on the merits.

T.W.'s as-applied challenge also fails because he has not introduced any evidence demonstrating that the Drug and Alcohol policy has been discriminatorily enforced against athletes.  T.W. correctly notes that all of the twenty-five students punished under this policy were student-athletes.  But absent evidence that such enforcement was discriminatory, this merely suggests that student-athletes are the only ones breaking the rule.  This conclusion is supported by Mr. Callahan's lack of knowledge of any non-student-athlete who has violated this rule and not been punished.  Without more, T.W. fails to meet his burden of showing the Drug and Alcohol policy has been unconstitutionally applied.  Consequently, T.W. is not likely to succeed on the merits of his equal protection claims challenging the Drug and Alcohol policy.

### b.    Section VII

Section VII and the burdens it places on students who participate in extracurriculars is also constitutional.  On this point, T.W.'s argument boils down to the assertion that it is irrational to hold the general student body to a *lower* standard than that set for students who participate in extracurriculars.[74]  He

---

sportsmanlike manner," violating team dress-codes, or quitting a team to join another without a coach's permission.  *Id.* at 5.
[74]   Doc. 131 at 14.

contends that "the District is unconcerned with promoting positive peer pressure in its non-extracurricular student body, and it makes no sense for the District to strive to ensure that extracurricular participants observe positive peer pressure while not mandating that the remainder of its students do so as well."[75]

This argument is wholly unpersuasive because it is premised entirely on T.W.'s subjective evaluation of the wisdom of the District's policy on regulating those who participate in extracurriculars.  It is clearly rational for the District to condition the privilege of participating in extracurriculars on compliance with a heightened code of conduct.  Such a system promotes respect for the rules and encourages students to behave ethically.  Further, if a student does not want to be subject to these rules, he or she can choose not to participate.  Though T.W. may claim such a system is not fair, these are simply the rules of the game.[76]

Accordingly, absent a more persuasive showing that such a system is irrational or arbitrary, the Court cannot find that Section VII of the Code of Conduct violates the Equal Protection Clause.

## 2.   Substantive Due Process

T.W.'s parents fail to establish that their substantive due process claim has a likelihood of success on the merits.  To assert a substantive due process claim

---

[75]   *Id.*

[76]   Importantly, the punishment for failing to comply with these rules is to withdraw access to the privilege.  Students will not be suspended from school for violating a rule in Section VII; at most, they will be prohibited from participating in the extracurricular activity.  Doc. 32-5 at 31-36.

under § 1983, "a plaintiff must demonstrate the defendant, acting under color of state law, deprived [plaintiff] of a right secured by the Constitution or the laws of the United States."[77]  Accordingly, the first step in evaluating such a claim is to "'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'"[78]  Because "the core of the concept [of due process is] protection against arbitrary action," "only the most egregious official conduct can be said to be arbitrary in the constitutional sense."[79]  Thus, to succeed on a substantive due process claim, a plaintiff "must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience."[80]

T.W.'s parents assert that the substantive right at issue is their right as parents to direct and control their children's upbringing and education.[81]  The United States Supreme Court first articulated this right in *Meyer v. Nebraska*[82] and *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*.[83]  In *Meyer*, the Court struck down a law forbidding the teaching of certain language to students

---

[77]  *Chainey v. Street*, 523 F.2d 200, 219 (3d Cir. 2008) (internal citations omitted).
[78]  *Id.* (citing *Nicini v. Morra*, 212 F.3d 279, 806 (3d Cir. 2000) (en banc)).
[79]  *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).
[80]  *Id.* (citing *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400-02 (3d Cir. 2003)).
[81]  *Troxel v. Granville*, 530 U.S. 57, 65 (2000).
[82]  262 U.S. 390 (1923).
[83]  268 U.S. 510 (1925).

at primary schools.[84]  And in *Pierce*, the Court held that states may not force parents to enroll their children in public school.[85]  The Court has also considered this right in the context of the child-parent relationship; however, it has mostly given attention to laws that directly infringe upon parental or custodial rights.[86]

The Supreme Court has yet to "define the precise boundaries of a parent's right to control a child's upbringing and education."[87]  "It is clear, however, that the right is neither absolute nor unqualified."[88]  Where the government has only indirectly infringed upon a parent's right, the infringement will be "subject to minimum scrutiny, requiring only that the action rationally advance a legitimate government interest."[89]  Because the District's policy does not directly impose upon T.W.'s parents,[90] this Court shall consider any effect it has on their interests to be incidental.  Consequently, this Court will review the District's policy under the rational basis test.

---

[84]   262 U.S. at 403.

[85]   268 U.S. at 534-35.

[86]   *E.g.*, *Troxel*, 530 U.S. at 71-72 (striking down a state law permitting courts to disregard decisions made by parents regarding visitation with third parties); *Santosky v. Kramer*, 455 U.S. 745, 769-70 (1982) (requiring states to support allegations by at least clear and convincing evidence to permanently sever parental rights); *Stanley v. Illinois*, 405 U.S. 645, 657 (1972) (holding that a father was entitled to a hearing on his fitness as a parent before losing parental rights).

[87]   *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005).

[88]   *Id.* (internal citations omitted).

[89]   *Angstadt v. Midd-West School Dist.*, 377 F.3d 338, 344 (3d Cir. 2004) (citing *Philadelphia Police and Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia*, 874 F.2d 156, 168 (3d Cir. 1989).

[90]   Unlike the cases cited above, the policy punishes only T.W., and not his parents, for his behavior.

T.W.'s parents have not shown that the District has infringed upon their right to direct and control T.W.'s upbringing and education.  They argue that the District's rule punishing students for attending parties where underage drinking or drug use is occurring "prohibits the parent from making decisions as to where and when it is acceptable for their children to socialize and under what circumstances."[91]  But T.W.'s parents do not cite any cases or attempt to explain why "making decisions as to where and when" their children socialize is or should be considered a constitutional right.  There are no cases previously, to this Court's knowledge, recognizing such a right.  And this Court declines to expand substantive due process merely to accommodate T.W.'s parents' claim.

Moreover, even if T.W.'s parents could establish such a right, they have not satisfied their burden of showing that the District's policy is irrational or shocks the conscience.  The District has a valid interest in discouraging and preventing alcohol and drug use amongst its students.[92]  Prohibiting students from attending parties where they are exposed to alcohol or drugs is rationally related to this interest.  Because T.W.'s parents cannot show that their right to direct and control

---

[91]  Doc. 4 at 16.

[92]  *See Morse*, 551 U.S. at 407 ("[D]eterring drug use by schoolchildren is an 'important—indeed, perhaps compelling' interest.") (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 655-56 (1995)); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 656 (1989) (acknowledging the government's strong interest in detecting drug use among certain employees).

T.W.'s upbringing and education has been violated, they have failed to establish a likelihood of success on the merits of their substantive due process claim.

### 3.    Procedural Due Process

T.W. also fails to establish that his procedural due process claim has a likelihood of success on the merits.  To succeed on a due-process claim, plaintiffs must prove: "(1) a deprivation of an individual interest encompassed by the Fourteenth Amendment's protection of life, liberty, or property, and (2) that the procedures available did not provide due process of law.[93]

In ruling on Plaintiffs' motion for a temporary restraining order, the Court previously held that the District created a due-process interest in participating in athletics by guaranteeing participants that they would be provided due process in any disciplinary proceedings.[94]  Further, this Court held that the District would satisfy the Due Process Clause if it complied with the procedures set forth in *Davis v. Central Dauphin School District School Board*[95] and *Goss v. Lopez*.[96]  For purposes of providing a comprehensive opinion, however, the Court will repeat its analysis of why this standard of review is appropriate.

---

[93]  *Culinary Serv. Of Delaware Valley, Inc. v. Borough of Yardley, Pa*, 385 Fed. Appx. 135, 140-41 (3d Cir. 2010) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006)); *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

[94]  T.W. v. Southern Columbia Area School District, No. 20-CV-1688, 2020 WL 5751219, at *6 (M.D. Pa. Sept. 25, 2020).

[95]  466 F. Supp. 1259 (M.D. Pa. 1979).

[96]  419 U.S. 565 (1975).

Students have a recognized property-interest in education.[97]  However, as this Court has stated previously in *Dallam v. Cumberland Valley School District*, students have an interest in the "entire process" of education; they do not have numerous individual property rights in the "myriad activities which combine to form" their entire education.[98]  Accordingly, students do not have a recognized, freestanding property-interest in participating in athletic and extracurricular activities.[99]

Nevertheless, a school may create such a property interest where it explicitly guarantees that it will provide students with due process.[100]  In *Davis*, this Court determined that the school in question created a property interest in playing basketball by informing students that they would receive due process before being subject to removal from an extracurricular activity.[101]  The Court interpreted this as requiring the school to provide the student with "oral or written notice of the charges against him and if he denies them, an explanation of the evidence that the school authorities have and an opportunity to present his side of the story."[102]  In setting forth these procedures, the Court looked to *Goss v. Lopez* for guidance.[103]

---

[97]  *Board of Regents v. Roth*, 408 U.S. 564, 570-71 (1972).
[98]  391 F. Supp. 358, 361 (M.D. Pa. 1975).
[99]  *Id.* at 362; *see also Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 344 (3d Cir. 2004); *Dominic J. v. Wyoming Valley West High School*, 362 F. Supp. 2d 560, 671 (M.D. Pa. 2005).
[100]  *Davis v. Central Dauphin School Dist. School Bd.*, 466 F. Supp. 1259, 1263-64 (M.D. Pa. 1979).
[101]  *Id.*
[102]  *Id.* (citing *Goss v. Lopez*, 419 U.S. 565, 581 (1975)).
[103]  *Id.*


Because *Goss* prescribed these exact requirements for students facing a ten-day suspension, this Court found it appropriate to adopt the same rules where a student faces possible removal from a sports team.[104]

Turning to the present case, the Court finds that the District has established a legal property-interest in participating in extracurriculars.  The Handbook's statement that all students subject to Section VII will be "provided due process" throughout the disciplinary process is enough to establish a legal interest in these activities.  That said, the District's suspension will only violate the Due Process Clause if the procedures offered do not satisfy the requirements set forth in *Davis*.[105]  The District will thus have provided T.W. with sufficient due process so long as it gave T.W. oral or written notice of the charges against him, and *if* he denies them, an opportunity to present his side of the story.

T.W. now argues that he has not been provided due process because he was not given notice of the factual basis underlying the charges against him.  He claims it was error for Mr. Callahan to not provide T.W. with the evidence against him, and that without this evidence, the District could not possibly have given T.W. sufficient notice.  T.W. argues that, to satisfy the notice requirement, the District needed to provide at least some, if not all, of the following information: (1) the

---

[104] *Id.*

[105] The Court does not take any opinion as to whether due process requires *less* than that set forth in *Davis*; it simply recognizes that satisfying the *Davis* requirements will be sufficient to defeat T.W.'s due process claim.

identity of T.W.'s accusers; (2) an explanation of the basis for the District's "reasonable suspicion"; (3) "the time T.W. arrived at the gathering"; (4) "the time alcohol purportedly arrived at the gathering"; (5) "whether T.W. was aware that alcohol was being consumed at the gathering"; and (6) "any other information for T.W. to make a reasoned response to the accusation of any wrongdoing."[106]

This argument is without merit. The factual predicate needed to establish a violation of the Drug and Alcohol policy is that a student was present at a party where underage drinking or drug use occurred. T.W. does not contest that this information was presented to him. The District was not required to provide the names of witnesses or any detailed explanation of the basis of its reasonable suspicion. To be clear, the District would need to present its evidence to T.W. were he to challenge the factual basis of these charges. But it does not need to present evidence simply to trigger the notice requirements of *Davis*.

Consequently, once the District informed T.W. that it had reasonable suspicion to believe T.W. had attended a party where underage drinking or drug use occurred, it then became T.W.'s prerogative to challenge the basis of this charge. Neither he nor Plaintiffs chose to do so.[107] And T.W. may not now circumvent the procedures set forth by the District that T.W. decided not to follow.

---

[106] Doc. 31 at 24-25.

[107] T.W. had at least two opportunities to raise such a challenge, the first being at the meeting with Mr. Callahan, and the second being after he received the letter formally suspending him (which provided T.W. with the opportunity to request an informal hearing). Doc. 32-10.

Accordingly, the Court concludes T.W. has received all the process due to him.

His procedural due process claim is therefore unlikely to succeed on the merits.[108]

### B.   Irreparable Harm

The second requirement for a temporary restraining order is "a showing that

the plaintiff will suffer irreparable harm if an injunction is not issued."[109]  In *D.M.*

*by Bao Xiong v. Minnesota State High School League*, the United States Court of

Appeals for the Eighth Circuit found that two students who were denied from

participating on their school's dance team had established irreparable harm.[110]  The

court reasoned that the students could not "get that season back," and that

"deprivations of temporally isolated opportunities[] are exactly what preliminary

injunctions are intended to relieve."[111]

Here, T.W. has sufficiently demonstrated irreparable harm.  Being unable to

participate in athletics for a year is a "temporally isolated opportunity" and is, the

Court agrees, precisely the type of injury that preliminary injunctive relief is

intended to prevent.  While the District is correct to note that *D.M by Bao Xiong*

dealt with a gender discrimination claim, the Eighth Circuit's temporal analysis is

---

[108]  Additionally, the Court declines to address T.W.'s alternative claim for relief that the District
has applied the wrong policy against him.  T.W. argues that, under the terms of the Handbook,
he has only violated the Drug and Alcohol policy twice.  Because this does not allege a due-
process or other constitutional violation, but instead challenges the District's interpretation of
its own Handbook, this claim is not properly before the Court.  The Court notes that such a
matter is precisely the type of issue that would be better raised before the *District*, not in federal
court.

[109]  *H. v. Easton Area School Dist.*, 827 F. Supp. 2d 392, 409 (E.D. Pa. 2011).

[110]  917 F.3d 994, 1003 (8th Cir. 2019).

[111]  *Id.*

still persuasive in interpreting the possible harm caused by being deprived of the opportunity to participate in athletics for a year. T.W. has thus satisfied his showing of irreparable harm.

### C.    Balance of Harm

The third factor, the balance of harms, requires determining "whether granting preliminary relief will result in even greater harm to the nonmoving party."[112] "To determine which way the balance of hardship tips, a court must identify the harm to be caused by the preliminary injunction against the possibility of the harm caused by not issuing it."[113] A court may consider a party's likelihood of success on the merits when determining in which direction the balance of harm tilts.[114] The Court is satisfied that the risk of harm from enjoining the District's ability to consistently enforce its disciplinary rules sufficiently outweighs the risk that T.W. faces as a result of his suspension. T.W. has not established a likelihood of success on the merits, and the balance of harms consequently weighs in favor of the District.

### D.    Public Interest

The fourth factor involves determining whether the public interest weighs in favor of or against injunctive relief. T.W. argues that the public interest weighs in

---

[112] *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999).

[113] *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007) (citing *Los Angeles Memorial Coliseum Commission v. NFL*, 634 F.2d 1197, 1203 (9th Cir. 1980)).

[114] *Easton Area School Dist.*, 827 F. Supp. 2d at 409.

favor of relief because, in the absence of legitimate countervailing concerns, "the public's interest favors the protection of constitutional rights."[115]  Here, however, neither T.W. nor his parents have established a likelihood of success on their constitutional claims.  Moreover, the public has a strong interest in deterring underage drinking amongst students that would be harmed by enjoining T.W.'s suspension.[116]  Accordingly, the public interest weighs against injunctive relief.

## IV.   CONCLUSION

Taken together, T.W. and his parents have not met their burden for proving that injunctive relief is warranted under the circumstances. His motion for a preliminary injunction is thus denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[115] *B.H. v. Easton Area Sch. Dist.*, 827 F. Supp. 2d 392, 409 (E.D. Pa. 2011) (quoting *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir. 1997)).

[116] *See Morse*, 551 U.S. at 407; *Acton*, 515 U.S. at 655-56; *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. at 656.